**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF:<br><br>JOHN DOES, United States person(s), who directly or indirectly had authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "SFOX"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016, through December 31, 2021. | No. 22 Misc. 213 (        ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'**
***EX PARTE* PETITION FOR LEAVE TO SERVE A JOHN DOE SUMMONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
*Attorney for Petitioner*
*United States of America*
86 Chambers Street, Third Floor
New York, New York 10007
Telephone:  (212) 637-2679
Facsimile:   (212) 637-2686

JEAN-DAVID BARNEA
Assistant United States Attorney
– Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ......................................................................................................................2

I.      "Cryptocurrency" Defined .............................................................................................2

II.     Tax Treatment of Cryptocurrency Transactions ...................................................3

III.    Information Regarding Cryptocurrency Transactions Held by M.Y. Safra.........................4

IV.     Grounds for the IRS's Belief that Virtual Currency Transactions Are Not Being
        Properly Reported ...........................................................................................................6

        A.  Suspected Tax Non-Compliance by SFOX Users .........................................................6

        B.  The Lack of Third-Party Reporting to the IRS .............................................................9

        C.  The John Doe Summons to Coinbase, Inc., and Its Aftermath...................................10

ARGUMENT ........................................................................................................................12

I.      Governing Law ..............................................................................................................12

II.     Application of § 7609(f) ................................................................................................14

        A.  The Summons Relates to the Investigation of an Ascertainable Class.......................15

        B.  There Is a Reasonable Basis for Believing that the John Doe Class May Fail, or
            May Have Failed, to Comply with the Internal Revenue Laws...................................17

        C.  The Information Sought in the Summons Is Not Readily Available from Other
            Sources..........................................................................................................................21

        D.  The Summons Is Narrowly Tailored to Information that Pertains to the Failure
            (or Potential Failure) of the Class to Comply with the Internal Revenue Laws.........24

CONCLUSION.......................................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

**Cases and Unpublished Orders**

*In re Does*,
    671 F.2d 977 (6th Cir. 1982) ................................................................. 19

*In re Does*,
    No. 02-22404-CIV, 2002 WL 32879613 (S.D. Fla. Aug. 20, 2002) .................................. 21, 23

*In re Does*,
    No. 1:00-CV-3919, 2000 WL 34538137 (S.D. Fla. Oct. 30, 2000) .................................. 20, 23

*In re Tax Liabs. of Does*,
    688 F.2d 144 (2d Cir. 1982) ................................................................. 18

*In re Tax Liab. of Does*,
    No. 03-22793-CIV, 2003 WL 22953182 (S.D. Fla. Oct. 30, 2003) .................................. 16, 22

*In re Tax Liab. of Does*,
    No. 2:10-mc-00130-MCE-EFB, 2011 WL 6302284 (E.D. Cal. Dec. 15, 2011) ..................... 16

*PAA Mgmt., Ltd. v. United States*,
    962 F.2d 212 (2d Cir. 1992) ................................................................. 13

*Sugarloaf Funding, LLC v. U.S. Dept. of Treas.*,
    584 F.3d 340 (1st Cir. 2009) ................................................................. 24

*Tiffany Fine Arts, Inc. v. United States*,
    469 U.S. 310 (1985) ................................................................. 14

*United States v. Arthur Young & Co.*,
    465 U.S. 805 (1984) ................................................................. 13

*United States v. Berkowitz*,
    488 F.2d 1235 (3d Cir. 1973) ................................................................. 24

*United States v. Coinbase, Inc.*,
    No. 17-cv-01431-JSC, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017) ........................... 10, 11

*United States v. Ernst & Whinney*,
    750 F.2d 516 (6th Cir. 1984) ................................................................. 14

*United States v. Euge*,
    444 U.S. 707 (1980) ................................................................. 13

*United States v. Gertner*,
    65 F.3d 963 (1st Cir. 1995) ............................................................... 14

*United States v. Island Trade Exchange, Inc.*,
    535 F. Supp. 993, 996-97 (E.D.N.Y. 1982) ............................................. 20

*United States v. John G. Mutschler & Assocs., Inc.*,
    734 F.2d 363 (8th Cir. 1984) ............................................................... 24

*United States v. Pittsburgh Trade Exchange, Inc.*,
    644 F.2d 302 (3d Cir. 1981) ............................................................... 20

*United States v. Powell*,
    379 U.S. 48 (1964) ........................................................................... 25

*United States v. Reprints, Inc.*,
    43 A.F.T.R.2d 79-463, 1978 WL 1238 (N.D. Ga. Nov. 18, 1978) ................... 24

*United States v. Ritchie*,
    15 F.3d 592 (6th Cir. 1994) ............................................................... 18

Order, *In re Does*,
    No. 03-22177 CIV-Martinez, ECF No. 10 (S.D. Fla. Apr. 2, 2004) ................. 21

Order, *In re Does*,
    No. 04-21986-CIV-UNGARO-BENAGES, ECF No. 5 (S.D. Fla. Aug. 5, 2004) ......... 21

Order, *In re Does*,
    No. 04-cv-1548 (OES), ECF No. 5 (D. Colo. Aug. 2, 2004) ......................... 21

Order, *In re Does*,
    No. 4:04-cv-94-1 (CDL), ECF No. 4 (M.D. Ga. Aug. 16, 2004) ..................... 21

Order, *In re Does*,
    No. CV-02-0049-MISC-PJH, ECF No. 4 (N.D. Cal. Mar. 27, 2002) .................. 20

Order, *United States v. Does*,
    No. 21mc91201-RGS, ECF No. 5 (D. Mass. Apr. 1, 2021) ................... 15, 19, 23

Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons,
    *In re Tax Liabs. of Does*, No. 11-cv-01686-PJH, ECF No. 10 (N.D. Cal. Apr. 7, 2011) ......... 23

Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons,
    *In re Tax Liabs. of Does*, No. 13-mc-00021, ECF No. 4 (S.D.N.Y. Jan. 29, 2013) ............... 17

Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons,
    *In re Tax Liabs. of Does*, No. 13-mc-377, ECF No. 3 (S.D.N.Y. Nov. 12, 2013) ................... 16

Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summonses,
   *In re Tax Liabs. of Does*, No. 21-mc-424, ECF No. 19 (S.D.N.Y. July 15, 2021)................. 16

Order Granting *Ex Parte* Petition for Leave to Serve John Doe Summonses,
   *In re Tax Liabs. of Does*, No. 13-mc-378, ECF No. 3 (S.D.N.Y. Nov. 7, 2013) ..................... 17

Order Granting *Ex Parte* Petition for Leave to Serve John Doe Summons,
   *United States v. Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal. Nov. 30, 2016) .......... 10

Order Granting Narrowed Petition, *United States v. Does*,
   No. 21-cv-02201-JCS, ECF No. 9 (N.D. Cal. May 5, 2021)........................................ 15, 19, 23

**Statutes**

26 U.S.C. § 1 .......................................................................................................... 4, 18, 25

26 U.S.C. § 61 ........................................................................................................ 4, 18, 25

26 U.S.C. § 451 ...................................................................................................... 4, 18, 25

26 U.S.C. § 1011 .................................................................................................... 4, 18, 25

26 U.S.C. § 1211 .................................................................................................... 4, 18, 25

26 U.S.C. § 1222 .................................................................................................... 4, 18, 25

26 U.S.C. § 7601(a) ...................................................................................................... 12

26 U.S.C. § 7602(a) ................................................................................................... 12, 13

26 U.S.C. § 7609(a)(1) .................................................................................................. 13

26 U.S.C. § 7609(b)(2)(A) .......................................................................................... 13, 14

26 U.S.C. § 7609(c)(3) .................................................................................................. 13

26 U.S.C. § 7609(f).............................................................................................. 1, 13, 14

26 U.S.C. § 7609(f)(1) ................................................................................................... 15

26 U.S.C. § 7609(f)(2) ................................................................................................... 18

26 U.S.C. § 7609(h)(2) ............................................................................................... 1, 13

26 U.S.C. § 7701(a)(30)................................................................................................. 15

Taxpayer First Act, Pub. L. No. 116-25, § 1204, 133 Stat. 981, 988 (2019)............................... 25

## Other Authorities

Patricia Cohen, *If the I.R.S. Is Watching You, You'll Pay Up*,
N.Y. Times, Jan. 4, 2016, at B1 ................................................................. 9

Joe Hernandez, *El Salvador Just Became the First Country to Accept Bitcoin as Legal
Tender*, NPR (Sept. 7, 2021) ................................................................. 3

H.R. Rep. No. 94-658 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897 ........................................ 18

H.R. Rep. No. 116-39 (2019) .................................................................................. 25

IRS, *Frequently Asked Questions on Virtual Currency Transactions* ............................................ 4

IRS Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Mar. 26, 2014) .................... 2, 3, 4

Barry W. Johnson & Peter J. Rose, IRS Publication 1415, *Federal Tax Compliance
Research: Tax Gap Estimates for Tax Years 2011–2013*, at 13 (Sept. 2019) .......................... 9

Jeff Kauflin, *Startup Raises $23 Million to Make Crypto Trades Faster and Stealthier*,
Forbes (Aug. 16, 2018) ..................................................................................... 5

U.S. Congress, Joint Committee on Taxation,
*Description of H.R. 1957, the "Taxpayer First Act of 2019"* (2019) ........................................ 25

U.S. Dep't of Justice, *Report of the Attorney General's Cyber Digital Task Force:
Cryptocurrency Enforcement Framework* (Oct. 8, 2020) ................................................. 3

U.S. Treasury Inspector General for Tax Admin., Ref. No. 2020-30-066, *The Internal
Revenue Service Can Improve Taxpayer Compliance for Virtual Currency Transactions*
(Sept. 24, 2020) ........................................................................................... 10

Wendy Walker, *INSIGHT: The 5 Most Common Tax Reportable Crypto Events*,
Bloomberg Tax (Aug. 20, 2020) ............................................................................ 10

The United States of America, on behalf of the Internal Revenue Service ("IRS"), by and through its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its *ex parte* petition for leave to serve a John Doe summons on M.Y. Safra Bank ("M.Y. Safra").

## PRELIMINARY STATEMENT

The proposed summons is sought to be served in furtherance of an ongoing IRS investigation to determine the identity and correct federal income tax liability of U.S. persons who have conducted transactions in cryptocurrency (defined below). *See* Declaration of Internal Revenue Agent Seng Tchong Lee dated July 20, 2022 ("Decl.") ¶¶ 3, 8, 33. Transactions in cryptocurrency have grown substantially in recent years, and the IRS is concerned that taxpayers are not properly reporting these transactions on their tax returns. The summons seeks account and transaction records from M.Y. Safra Bank that are expected to aid the IRS's investigation.

The summons is a so-called "John Doe" summons because it does not identify the persons with respect to whose liabilities the summons is issued. *See* 26 U.S.C. § 7609(f). The government therefore must obtain court approval prior to serving the summons. *Id*. As discussed below, the statutory criteria for court approval of a John Doe summons are met.

Pursuant to § 7609(h)(2), a court's determination whether a John Doe summons may be served is to be made *ex parte* based solely on the petition and supporting affidavits. The pleadings filed in this proceeding will therefore not be served upon any person or entity, and no other filings are permitted from other persons or entities. The United States respectfully asks this Court to review the petition and supporting documents and to enter the proposed order at the Court's earliest opportunity.

**BACKGROUND**

The summons seeks account and transaction records from M.Y. Safra, which partnered with a cryptocurrency prime dealer known as SFOX to provide account services to clients.  In particular, the summons seeks records regarding SFOX customers whose identities are not known to the IRS.  The group is defined as follows: United States person(s), who directly or indirectly had authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX, Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, "SFOX"), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016, through December 31, 2021 (the "John Doe Class").  The six document requests in the summons are directed at three broad categories: user identity information, transaction activity, and reports of abnormal transactions. Before addressing why a summons for these requested items directed at this John Doe Class meets the criteria in § 7609(f), this brief first provides relevant background regarding (I) the definition of cryptocurrency, (II) its tax treatment, (III) the information regarding taxable cryptocurrency transactions that is in the possession of M.Y. Safra, and (IV) the grounds for the IRS's belief that these transactions are not being properly reported on customers' returns.

**I.    "Cryptocurrency" Defined**

"Cryptocurrency" is one kind of "virtual currency."  IRS Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Mar. 26, 2014).  The IRS has defined "virtual currency" as "a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value."  *Id.*  It sometimes operates like "real" or "fiat" currency, *i.e.*, "the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance."  *Id.*

But virtual currency only has legal tender status in El Salvador.[1]  When virtual currency has an equivalent value in real currency, or acts as a substitute for real currency, then it is referred to as "convertible" virtual currency.  *Id.*

The summons at issue here solely concerns "cryptocurrency."  Cryptocurrency is a type of virtual currency that utilizes cryptography to secure transactions that are digitally recorded on a distributed ledger (such as a blockchain).  Decl. ¶¶ 16, 18.  Distributed ledger technology uses independent digital systems to record, share, and synchronize transactions, the details of which are recorded in multiple places at the same time with no central data store or administration functionality.  *See generally* U.S. Dep't of Justice, *Report of the Attorney General's Cyber Digital Task Force: Cryptocurrency Enforcement Framework* (Oct. 8, 2020), https://www.justice.gov/ag/page/file/1326061/download [https://perma.cc/Q2XH-5LF9].  Units of cryptocurrency are generally referred to as coins or tokens.  Decl. ¶ 16.  The most common cryptocurrency is Bitcoin, but there are many others.[2]  The technological innovation, rapid growth, and decentralized nature of cryptocurrency have created new challenges for regulators, including the IRS.  *See generally Report of the Attorney General's Cyber Digital Task Force*, *supra.*

## II.    Tax Treatment of Cryptocurrency Transactions

Convertible virtual currencies (including cryptocurrency) are considered property for tax purposes, and a taxpayer can have a taxable gain or loss on the sale or exchange of a virtual currency.  *See* IRS Notice 2014-21.  Thus, taxpayers who transact in virtual currencies may have

---

[1] *See* Joe Hernandez, *El Salvador Just Became the First Country to Accept Bitcoin as Legal Tender*, NPR (Sept. 7, 2021), https://www.npr.org/2021/09/07/1034838909/bitcoin-el-salvador-legal-tender-official-currency-cryptocurrency [https://perma.cc/J3YY-7BGT].

[2] As of January 7, 2022, cryptocurrency tracking website www.coinmarketcap.com indicated that more than 16,520 separate cryptocurrencies existed.  Decl. ¶ 17.

related tax filing and reporting requirements under various provisions of the Internal Revenue

Code, including 26 U.S.C. §§ 1, 61, 451, 1011, 1211, and 1222.

Taxpayers often complete their virtual currency transactions through businesses known as

digital currency exchanges, which allow users to buy and sell cryptocurrency in exchange for fiat

currency or other virtual currency.  Decl. ¶ 26.  Depending on the details, these transactions may

be taxable.  *See id*. ¶ 34.  Taxpayers must report income, gain, or loss from all taxable

transactions involving virtual currency on their federal income tax returns for the year of the

transactions, regardless of the amount or whether they received a payee statement or information

return.  *See* IRS, *Frequently Asked Questions on Virtual Currency Transactions*, Questions 4, 42,

43, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-

virtual-currency-transactions [https://perma.cc/634V-UW5P]; *see* Decl. ¶¶ 34-36 & n.4.

Specifically, taxpayers must generally report on their tax returns gains or losses upon the

disposition of virtual currency—i.e., the difference between their adjusted basis in the currency

and the amount received in exchange for it.  *See* Decl. ¶¶ 34-35 & n.4.  The IRS notified

taxpayers in 2014 that virtual currency is treated as property for tax purposes, *see id.* ¶ 37 (citing

IRS Notice 2014-21), and added questions specifically about virtual currency transactions to the

individual tax forms beginning in 2019, *see id.*

## III.    Information Regarding Cryptocurrency Transactions Held by M.Y. Safra

OX Labs Inc. is the parent company for a U.S.-operating subsidiary that does business

under the trade name SFOX.  *Id.* ¶¶ 61-62.  SFOX is a cryptocurrency prime dealer and trading

platform that connects exchanges, over-the-counter ("OTC") brokers, and liquidity providers

globally.  *Id.* ¶ 64.  SFOX has over 175,000 registered users, and users have undertaken more

than $12 billion in transactions since 2015.  *Id.* ¶ 69.  As described by *Forbes Magazine*:

> Sfox aims to provide a single point of access for institutional investors, like crypto hedge funds and family offices, that move large amounts of money. Its platform plugs into digital currency exchanges and OTC desks . . . and tries to get the lowest price for buyers (and the highest price for sellers). It does that by using a "smart router" that scans the different trading venues for prices and tries to lock in the best deals . . . . To make money, Sfox charges transaction fees, which range from 0.25% to 0.75%, depending on the type of order. Over the past 12 months, it processed $5.4 billion in trades and brought in an estimated $15 million in revenue.

*Id*. (quoting Jeff Kauflin, *Startup Raises $23 Million to Make Crypto Trades Faster and Stealthier*, Forbes (Aug. 16, 2018), https://www.forbes.com/sites/jeffkauflin/2018/08/16/startup-raises-23-million-to-make-crypto-trades-faster-and-stealthier/ [https://perma.cc/UNZ9-J8YB]).

SFOX has partnered with M.Y. Safra to offer SFOX users access to cash deposit bank accounts. *Id.* ¶ 97.[3] SFOX users who signed up for this service would generally hold interests in pooled accounts at M.Y. Safra. *Id.* ¶ 98. Certain SFOX users were also eligible to open standard commercial accounts at M.Y. Safra. *Id.* All users with access to M.Y. Safra account services were required to go through M.Y. Safra's customer onboarding process, including its "Know Your Customer" ("KYC") process, which involves providing the bank with user identifying information. *Id.* ¶ 99. SFOX users were able to use their funds at M.Y. Safra to buy and sell positions in digital currency from SFOX. *Id.* When SFOX users initiated funds-transfers to buy or sell cryptocurrency, SFOX served as an intermediary to provide M.Y. Safra with transaction instructions, and M.Y. Safra would then initiate the funds transfer. *Id.* ¶ 100.

Based on M.Y. Safra's arrangement with SFOX, the IRS expects that, in response to the John Doe summons, M.Y. Safra will be able to provide information about the identities and cryptocurrency transactions of SFOX users that also used M.Y. Safra's services, which the IRS will then be able to use in conjunction with other information to examine whether these users have complied with the internal revenue laws. *Id.* ¶ 33.

---

[3] The precise timeframe of this partnership is not currently known to the IRS, but it is known to have existed at least in 2019. *See id.* ¶¶ 98 & n.7, 101 & n.8.

**IV.    Grounds for the IRS's Belief that Virtual Currency Transactions Are Not Being Properly Reported**

In recent years, the IRS has become aware of significant tax compliance issues relating to the use of virtual currencies.  *Id.* ¶ 4.  Of particular relevance, the IRS has reason to believe that virtual currency transactions are not being properly reported based on Agent Lee's knowledge about likely tax non-compliance by specific SFOX users; the lack of third-party reporting in connection with such transactions; the IRS's experience with the John Doe summons it served on Coinbase, Inc., a U.S.-based digital currency exchange; and internal IRS data analyzed in connection therewith.

**A.  Suspected Tax Non-Compliance by SFOX Users**

As explained in detail in his declaration, Agent Lee has conducted an investigation and identified specific individuals who held accounts with SFOX and failed to comply with their tax reporting requirements under the internal revenue laws.  *Id.* ¶¶ 102-12.  Ten specific taxpayers—referred to as "Taxpayer 1" through "Taxpayer 10"[4]—who appear to have unreported income by not reporting income associated with their cryptocurrency transactions are discussed in the declaration.  The IRS has also learned that apparent SFOX users have transferred and received funds through M.Y. Safra accounts.  *Id.* ¶ 116 n.12.

Taxpayer 1 appears to have underreported his personal income after he was involved in an alleged Ponzi scheme in 2016-2018.  *Id.* ¶ 103.  As part of the scheme, this taxpayer and a wholly owned limited-liability company received approximately $1 million from various third-party merchants, digital currency exchanges, and SFOX.  Taxpayer 1's tax filings for the relevant tax years do not report any gain or loss from virtual currency transactions, however.  *Id.*

---

[4] These taxpayers are not being identified by name because the IRS's investigation of these taxpayers is currently confidential.

Taxpayer 2 received cryptocurrency deposits in connection with gambling winnings and YouTube videos he created. *Id.* ¶ 104. In 2018 and 2019, this taxpayer deposited approximately $120,000 worth of cryptocurrency into an SFOX account, immediately exchanged it for U.S. dollars, and transferred the money to a different bank account. *Id.* Taxpayer 2 answered "Yes" to the 2019 Schedule 1 question, "At any time during 2019, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency during the year?," but did not report any gain or loss from virtual currency transactions on the 2018 or 2019 tax returns. *Id.*

In 2018, Taxpayer 3 made deposits into SFOX accounts of Bitcoin worth approximately $120,000, and subsequently exchanged the Bitcoin for U.S. dollars and transferred the resulting funds to a personal bank account. *Id.* ¶ 105. This taxpayer did not report any gain or loss from virtual currency transactions on the relevant tax return. *Id.*

In 2018 and 2019, Taxpayer 4 deposited approximately $60,000 worth of Bitcoin into an SFOX account, and subsequently converted the Bitcoin into U.S. dollars and transferred approximately $55,000 of the resulting funds to a personal bank account. *Id.* ¶ 106. Taxpayer 4 did not file a tax return for 2018, and the taxpayer's 2019 return did not report any gain or loss from virtual currency transactions. *Id.*

Between October 2018 and March 2019, Taxpayer 5 made deposits into the taxpayer's bank account that originated from third parties, including approximately $7,000 from SFOX, and subsequently withdrew approximately $30,000 in cash from the account. *Id.* ¶ 107. Taxpayer 5's 2018 and 2019 tax returns did not report any gain or loss from virtual currency transactions on any schedule or form. *Id.*

Similarly, Taxpayer 6 made bank account deposits of $30,000 in 2017 and 2018 that originated from third parties, including SFOX and a digital currency exchange, as well as

$20,000 from unknown sources.  *Id.* ¶ 108.  The taxpayer subsequently withdrew approximately

$45,000 of the deposited funds from the account.  *Id.*  Taxpayer 6's 2017 and 2018 returns did

not report any gain or loss from virtual currency transactions on any schedule or form.  *Id.*

Taxpayer 7 deposited approximately $20,000 in cryptocurrency in 2018 and $60,000 in

cryptocurrency in 2019 into SFOX accounts, and subsequently converted the cryptocurrency into

U.S. dollars and transferred the funds to a bank account.  *Id.* ¶ 109.  Taxpayer 7 did not report

any gain or loss from virtual currency transactions on a 2018 tax return.  The taxpayer reported

cryptocurrency proceeds of approximately $10,000 on Schedule D of a 2019 return, but this

amount was significantly less than the value of the known transactions that occurred that year,

and likely reflects underreported income.  *Id.*

Taxpayer 8 made cryptocurrency deposits into an SFOX account totaling approximately

$5,000 in November 2018, and subsequently converted it to U.S. dollars and transferred the

funds to the taxpayer's personal bank account.  *Id.* ¶ 110.  No associated gain or loss from virtual

currency transactions was reported on the taxpayer's 2018 tax return.  *Id.*

Taxpayer 9 deposited two units of Bitcoin (which were worth a total of approximately

$10,000 at the time) into an SFOX account in June 2018.  *Id.* ¶ 111.  The taxpayer exchanged the

Bitcoin for U.S. dollars on the same day and transferred the funds to the taxpayer's bank

account.  *Id.* Taxpayer 9 did not report any gain or loss from virtual currency transactions on any

schedule or form on the taxpayer's 2018 tax return.  *Id.*

Between October 2018 and January 2019, Taxpayer 10's personal bank account was

funded with deposits from digital currency exchanges totaling approximately $5,000, including

approximately $4,000 from SFOX that appear to be proceeds from the exchange of

cryptocurrency.  *Id.* ¶ 112.  The taxpayer's bank account also reflected transfers totaling

approximately $5,000 to a digital currency exchange. *Id.* Taxpayer 10's 2018 and 2019 tax returns did not report any gain or loss from virtual currency transactions on any schedule or form. *Id*.

Based on these examples, the IRS suspects that there may be many more SFOX users who have failed to report their cryptocurrency transactions and to pay their associated tax liabilities, in accordance with the internal revenue laws.

### B.  The Lack of Third-Party Reporting to the IRS

SFOX does not make any reports to the IRS of cryptocurrency transactions that occur on its platforms. *Id.* ¶ 46; *see also id.* ¶ 121 (stating that the IRS does not already possess the information requested by the summons). This information gap is a concern for the IRS because, as Agent Lee's declaration explains, cryptocurrency transactions can be difficult to trace, with many having an inherently pseudo-anonymous aspect, making them especially attractive to taxpayers who may want to use them to hide taxable income. *Id*. ¶¶ 44-45.

More generally, the IRS's experience is that tax noncompliance increases when there is less third-party information reporting, making the likelihood of underreporting significant. *Id.* ¶ 46; *see* Barry W. Johnson & Peter J. Rose, IRS Publication 1415, *Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011–2013*, at 13 (Sept. 2019), https://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/2XM5-PDNH] (finding that the net misreporting percentage "for income amounts subject to little or no information reporting . . . is 55 percent"); *see also* Patricia Cohen, *If the I.R.S. Is Watching You, You'll Pay Up*, N.Y. Times, Jan. 4, 2016, at B1, https://www.nytimes.com/2016/01/05/business/economy/if-the-irs-is-watching-you-youll-pay-up.html [https://perma.cc/S9DK-QYU6].

Unfortunately, the problem of a lack of third-party reporting of cryptocurrency transactions is not limited to SFOX. *See* Wendy Walker, *INSIGHT: The 5 Most Common Tax*

*Reportable Crypto Events*, Bloomberg Tax (Aug. 20, 2020), https://news.bloombergtax.com/daily-tax-report/insight-the-5-most-common-tax-reportable-crypto-events [https://perma.cc/TH2J-5TT6] (noting that "a recent survey of crypto CPAs found that more than 35% of crypto investors do not receive Form 1099 information related to their crypto transactions").  As the Treasury Inspector General for Tax Administration ("TIGTA") has reported, "[t]he IRS cannot easily identify taxpayers with virtual currency transactions because of the lack of third-party information reporting that specifically identifies virtual currency transactions."  TIGTA, Ref. No. 2020-30-066, *The Internal Revenue Service Can Improve Taxpayer Compliance for Virtual Currency Transactions* at 10 (Sept. 24, 2020), https://www.treasury.gov/tigta/auditreports/2020reports/202030066fr.pdf [https://perma.cc/83SZ-YJUK].

### C.  The John Doe Summons to Coinbase and Its Aftermath

In November 2016, the U.S. District Court for the Northern District of California authorized service of a John Doe summons on Coinbase, Inc. ("Coinbase"), a U.S.-based cryptocurrency exchange, for information to be used in identifying taxpayers who conducted transactions in virtual currency.  *See* Order Granting *Ex Parte* Petition for Leave to Serve John Doe Summons, *United States v. Doe*, No. 3:16-cv-06658-JSC, ECF No. 7 (N.D. Cal. Nov. 30, 2016).  Coinbase was served with the summons but did not voluntarily comply with it.  Decl. ¶ 10.  The government then petitioned to enforce the summons, and after the IRS agreed to narrow the scope of the summons, the court granted in part and denied in part the enforcement petition.  *See United States v. Coinbase, Inc.*, No. 17-cv-01431-JSC, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017).  Coinbase was ordered to produce documents for accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one year for the period between 2013 and 2015.  *Id*. at *8.

Since Coinbase ultimately complied with the John Doe summons, the IRS has continued to reach out to taxpayers engaged in virtual currency transactions regarding their reporting requirements, to conduct examinations, and to make referrals to its Criminal Investigation Division.  Decl. ¶ 49.  On July 26, 2019, the IRS announced that it had begun sending letters to owners of virtual currency, advising them to pay back taxes and file amended returns.  *Id.* ¶ 14.  By the end of August 2019, the IRS had sent more than 10,000 such letters to taxpayers.  *Id.*  Following the issuance of such letters, many taxpayers filed amended returns reporting virtual currency transactions for tax years 2013 through 2019 that were not previously reported.  *Id.* ¶ 50.  To date, these IRS letters have resulted in more than $17.6 million in assessments.  *Id.*

The IRS has also opened audits of taxpayers identified by materials it received in response to the Coinbase John Doe summons, and it has received submissions through its voluntary disclosure practice as well.  *Id.* ¶ 49.  Separately, the IRS has contacted taxpayers who have not filed returns reporting virtual currency by sending them notices related to virtual currency.  *Id.* ¶ 50.  Those notices have already resulted in more than $17.6 million in assessments.  *Id.*  The IRS expects these numbers to increase as the investigations continue.  *Id.*  More recently, the IRS has sent letters to taxpayers who conducted transactions with foreign virtual currency exchanges and may have failed to properly report such transactions and associated income.  *Id.* ¶ 51.

During the summons enforcement litigation against Coinbase, the IRS determined, based on searches of internal data, that for the years 2013-2015, only 800 to 900 taxpayers per year filed tax returns with a property description related to Bitcoin or virtual currency, despite the fact that Coinbase alone had serviced more than 5.9 million customers and handled more than $6 billion in transactions during that time.  *See Coinbase*, 2017 WL 5890052, at *1-2, 4-5; Decl.

¶ 47.  This was strong evidence of likely large-scale underreporting of taxable transactions. Following the service of the *Coinbase* summons in December 2016, the number of taxpayers filing returns with a property description related to Bitcoin or virtual currency increased significantly in 2017-2019, but the numbers still fall far short of what would be expected given the number of users, transactions, and value that the exchanges publicize occur on an annual basis.  *See* Decl. ¶ 48.

## ARGUMENT

### I.    Governing Law

The IRS is statutorily required to have its employees "proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax."  26 U.S.C. § 7601(a).  To this end, the IRS has broad investigative powers "[f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability."  *Id.* § 7602(a).  To fulfill these purposes, the IRS "is authorized" by statute:

> (1)     To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

> (2)     To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

> (3)     To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

*Id.*

Congress intended "to provide the [IRS] with broad latitude to adopt enforcement techniques helpful in the performance of [its] tax collection and assessment responsibilities." *United States v. Euge*, 444 U.S. 707, 716 n.9 (1980).  Indeed, the Supreme Court has noted that the IRS's summons power forms the "centerpiece" of the agency's "expansive information-gathering authority."  *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984).  Because "the summons power of the IRS under the Code is quite broad, . . . courts are constrained to exercise caution before circumscribing the summons authority."  *PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 216 (2d Cir. 1992); *see also Arthur Young*, 465 U.S. at 816 ("[T]he very language of § 7602 reflects . . . a congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry." (emphasis in original)).

When issuing an administrative summons to a third party regarding a taxpayer, the IRS is generally required to give notice to the taxpayer. 26 U.S.C. § 7609(a)(1).  The taxpayer then has the right to file a petition in court seeking to quash the summons.  *Id.* § 7609(b)(2)(A).  However, the third-party notice rules do not apply to certain types of summonses, including a so-called "John Doe" summons, *see id.* § 7609(c)(3), defined as a summons that "does not identify the person with respect to whose liability the summons is issued," *id.* § 7609(f).  Instead, a John Doe summons "may be served only after a court proceeding" establishing the elements listed in § 7609(f).  *Id.*  This proceeding is necessarily *ex parte* because the point of a John Doe summons is to allow the IRS to obtain information when the identity of the taxpayer is unknown.  *See id.* § 7609(h)(2) (stating that the court's determination under § 7609(f) "shall be made ex parte and shall be made solely on the petition and supporting affidavits").

The reviewing court, in such an *ex parte* proceeding, effectively serves the same function as a taxpayer in a § 7609(b)(2)(A) petition to quash. *See Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 317 (1985) ("As a substitute for the procedures of §§ 7609(a) and (b), Congress enacted § 7609(f) . . . ."); *United States v. Gertner*, 65 F.3d 963, 965 n.1 (1st Cir. 1995) ("[T]he court in effect 'takes the place of the affected taxpayer' who, being unnamed, cannot herself be expected to know about—let alone to oppose—the summons even if it is irregular." (quoting *Tiffany Fine Arts*, 469 U.S. at 321)).  "Congress did not intend to impose stringent restrictions on the [IRS's] investigatory function but merely sought to prevent the indiscriminate exercise of the John Doe summons power."  *United States v. Ernst & Whinney*, 750 F.2d 516, 519-20 (6th Cir. 1984) (internal quotation marks and emphasis omitted).

The IRS may not serve a John Doe summons until it establishes the following elements:

(1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,

(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

(3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

26 U.S.C. § 7609(f).  Additionally, as of 2019, the statute requires that any summons be "narrowly tailored to information that pertains to the failure (or potential failure) of the person or group or class of persons referred to in paragraph (2) to comply with one or more provisions of the internal revenue law which have been identified for purposes of such paragraph."  *Id.*

## II.     Application of Section 7609(f)

The summons at issue here meets all three of the numbered criteria in § 7609(f) as well as the new "narrowly tailored" requirement.  At least two courts have granted similar applications

for the IRS to serve John Doe summonses seeking cryptocurrency-related information that is similar to the information sought here and based on similar evidence.  *See* Order, *United States v. Does*, No. 21mc91201-RGS, ECF No. 5 (D. Mass. Apr. 1, 2021) ("*Circle Internet Financial, Inc.*"); Order Granting Narrowed Petition, *United States v. Does*, No. 21-cv-02201-JCS, ECF No. 9 (N.D. Cal. May 5, 2021) ("*Payward Ventures Inc. d/b/a Kraken*").

### A.  The Summons Relates to the Investigation of an Ascertainable Class

The first of the requirements in § 7609(f) is that "the summons relates to the investigation of a particular person or ascertainable group or class of persons."  *Id.* § 7609(f)(1).  This prong is met here because the John Doe Class is particularized from the general public and M.Y. Safra has the information necessary to ascertain whether its customers are members of the class.

As noted above, the summons defines the John Doe Class as follows: "United States person(s), who directly or indirectly had authority over any combination of accounts held with OX Labs Inc., d/b/a SFOX, SFOX, Inc., sfox.com, or its predecessors, subsidiaries, divisions, or affiliates (collectively, 'SFOX'), with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the period January 1, 2016, through December 31, 2021."  This class is ascertainable because it is limited in at least four ways.  First, it is limited to SFOX account holders.  Second, it is limited to United States persons.[5]  Third, it is

---

[5] As defined in the Internal Revenue Code:

> The term "United States person" means—
> (A) a citizen or resident of the United States,
> (B) a domestic partnership,
> (C) a domestic corporation,
> (D) any estate (other than a foreign estate, within the meaning of paragraph (31)), and
> (E) any trust if—
>> (i) a court within the United States is able to exercise primary supervision over the administration of the trust, and
>> (ii) one or more United States persons have the authority to control all substantial decisions of the trust.

26 U.S.C. § 7701(a)(30).

limited to those account holders whose transactions were worth at least $20,000 in a year. Fourth, it is limited to the six-year time period of 2016-2021.

The John Doe Class identified in the summons is "ascertainable" because courts have repeatedly found § 7609(f)(1) to be satisfied where a summons identifies a particular group of taxpayers in a similar manner. For example, this requirement was satisfied where a summons "squarely particularize[d] the individuals sought from the general public" by identifying the class as California residents who, between 2005 and 2010, were involved in certain property transfers for little or no consideration. *See In re Tax Liab. of Does*, No. 2:10-mc-00130-MCE-EFB, 2011 WL 6302284, at *2 (E.D. Cal. Dec. 15, 2011). Likewise, the IRS satisfied the "ascertainable group" standard where a summons concerned U.S. taxpayers who, as agents for subsidiaries of a certain company, sold credit insurance policies reinsured with entities in the Turks and Caicos Islands. *See In re Tax Liab. of Does*, No. 03-22793-CIV, 2003 WL 22953182, at *1 (S.D. Fla. Oct. 30, 2003) ("*American Bankers Insurance Group*").

Additionally, courts in this District have repeatedly authorized the issuance of John Doe summonses where the target group is comprised of individuals with interests in financial accounts managed or established by a particular entity. *See* Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summonses, *In re Tax Liabs. of Does*, No. 21-mc-424, ECF No. 19 (S.D.N.Y. July 15, 2021) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers who used the services of a particular entity to establish and maintain offshore accounts and entities); Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons, *In re Tax Liabs. of Does*, No. 13-mc-377, ECF No. 3 (S.D.N.Y. Nov. 12, 2013) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of U.S. taxpayers who had interests in or authority over financial accounts maintained at or managed by

The Bank of N.T. Butterfield & Son Ltd. or other institutions that the bank permitted to transact business through its U.S. correspondent accounts); Order Granting *Ex Parte* Petition for Leave to Serve John Doe Summonses, *In re Tax Liabs. of Does*, No. 13-mc-378, ECF No. 3 (S.D.N.Y. Nov. 7, 2013) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of analogous group of U.S. taxpayers with interests in financial accounts related to Zurcher Kantonalbank, a Swiss bank); Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons, *In re Tax Liabs. of Does*, No. 13-mc-00021, ECF No. 4 (S.D.N.Y. Jan. 29, 2013) (granting *ex parte* petition for leave to serve John Doe summonses in investigation of analogous group of U.S. taxpayers with interests in financial accounts related to Wegelin & Co., a Swiss bank, including accounts at financial institutions that the bank permitted to transact client business through its United States correspondent account).

Moreover, as discussed in Part III above, M.Y. Safra should be able to ascertain from its records which of the SFOX users who used M.Y. Safra's account services were U.S persons, and who among them engaged in transactions equaling or exceeding $20,000 during the relevant years, based on the information that the IRS expects M.Y. Safra collected on the SFOX users who were also M.Y. Safra customers.  The availability of this information to M.Y. Safra means that the John Doe Class is an "ascertainable group of class of persons" and that § 7609(f)(1) is satisfied.[6]

### B.  There Is a Reasonable Basis for Believing that the John Doe Class May Fail, or May Have Failed, to Comply with the Internal Revenue Laws

The second element that the government must establish is that "there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply

---

[6] To the extent there are U.S. taxpayers who are SFOX users whose identities are known to the IRS at the time the summons is issued, they are excluded from the class, and will be identified to M.Y. Safra.  Decl. ¶ 121.

with any provision of any internal revenue law."  26 U.S.C. § 7609(f)(2).  Taxpayers must report

income, gain, or loss from all taxable transactions involving cryptocurrency on their federal

income tax returns for the year of the transactions.  See *id.* §§ 1, 61, 451, 1011, 1211, and 1222.

Here, there is a reasonable basis for believing that members of the John Doe Class may fail (or

may have already failed) to report, or to pay tax associated with, cryptocurrency transactions.

This belief is based upon the information discussed in Part IV, above: Agent Lee's personal

knowledge of non-compliance by SFOX users; the lack of third-party reporting to the IRS by

SFOX regarding its customers' transactions; and the IRS's experience with the Coinbase John

Doe summons and its aftermath, including the search results showing likely large-scale

underreporting of taxable cryptocurrency transactions.

　　　　To meet the "reasonable basis" prong of § 7609(f)(2), the government need only show

that a transaction has occurred that is "of such a nature as to be reasonabl[y] suggestive of the

possibility that the correct tax liability with respect to that transaction may not have been

reported."  H.R. Rep. No. 94-658 at 311 (1975), *reprinted in* 1976 U.S.C.C.A.N. 2897, 3208;

*see, e.g.*, *United States v. Ritchie*, 15 F.3d 592, 601 (6th Cir. 1994) (clients' payment for legal

services with large amounts of cash provided reasonable basis for John Doe summons).  When

enacting § 7609(f), Congress did "not intend to impose an undue burden on the [IRS] in

connection with obtaining a court authorization to serve this type of summons."  H.R. Rep. No.

94-658, at 311.  Rather, it sought to ensure that the IRS would have "a specific situation to

present in the court," instead of using the summonses to engage in a "possible 'fishing

expedition.'"  *Id.*; *see also In re Tax Liabs. of Does*, 688 F.2d 144, 149 (2d Cir. 1982) (Section

7609(f) was "concerned only with . . . preclud[ing] the IRS from using [John Doe] summonses to

engage in possible 'fishing expeditions.'" (quoting H.R. Rep. No. 94-658, at 311)).  The

government need not "produce conclusive evidence of an actual tax violation as a prerequisite to obtaining a John Doe summons." *In re Does*, 671 F.2d 977, 980 (6th Cir. 1982) (per curiam) ("*Columbus Trade Exchange*").  The point of the statute is merely "to prevent the [IRS] from exercising its summons power in an arbitrary or quixotic manner."  *Id.*

Recently, the IRS has sought and received leave to serve two other John Doe summonses seeking cryptocurrency-related information that is similar to the information sought here and based on similar evidence.  The first such summons was issued on April 9, 2021, to Circle Internet Financial, Inc., which offers digital currency exchange services.  *See* Order, *Circle Internet Financial, Inc.*, *supra*.  The second was issued to Payward Ventures Inc. d/b/a Kraken, a digital currency exchange, on May 11, 2021.  *See* Order Granting Narrowed Petition, *Payward Ventures Inc. d/b/a Kraken*, *supra*.  The United States and both summoned parties are in the process of negotiating compliance with those summonses.  Decl. ¶ 15.

Moreover, prior experience with similar transactions involving similar parties can constitute a reasonable basis under § 7609(f)(2).  For example, in the early 1980s, the IRS sought approval to serve several John Doe summonses on so-called barter exchanges.  *See, e.g.*, *Columbus Trade Exchange*, 671 F.2d 977.  Those exchanges are analogous to virtual currency exchanges insofar as the IRS's experience showed that their customers, whose identities were unknown, were likely underreporting the tax on their transactions.  *See, e.g.*, *id.* at 980.  In affirming the district court's order approving the issuance of the summons, the Sixth Circuit held that the IRS's "past experience with this problem is a 'reasonable basis' for its decision to investigate the returns of Columbus Exchange members."  *Id.*

Other courts have reached similar conclusions.  *See, e.g.*, *United States v. Pittsburgh Trade Exchange, Inc.*, 644 F.2d 302, 306 (3d Cir. 1981) (finding, based on IRS agent's

testimony, that "barter transactions such as those arranged by The Exchange are inherently susceptible to tax error since no cash is involved and the only records of the members' credits are kept by The Exchange, which allegedly does not provide members any information regarding their trade accounts.  Such circumstances provide a sufficient basis for the Internal Revenue Service's action"); *United States v. Island Trade Exchange, Inc.*, 535 F. Supp. 993, 996-97 (E.D.N.Y. 1982) (approving John Doe summons to barter exchange and finding "reasonable basis" requirement in § 7609(f)(2) met based on IRS agent's declaration that "prior examinations of bartering exchanges and their members by the [IRS] revealed high levels of omitted or improperly reported income," as well as features of bartering transactions that made them susceptible to improper tax reporting).  Similarly here, the IRS's knowledge of non-compliance by some SFOX users, the Coinbase John Doe summons, the recent Circle and Kraken John Doe summonses, and other situations in which there is a lack of third-party reporting all strongly suggest that there is a reasonable basis for the summons in this case.

As in the barter-exchange cases, in all of the John Doe summons cases arising from the IRS's Offshore Credit Card Project, courts found a "reasonable basis" for suspecting non-compliance by offshore credit card users based on the IRS's general experience with undisclosed foreign accounts—even in the absence of audits involving the summoned parties—because individuals using credit cards to repatriate funds from offshore bank accounts are likely to be engaged in tax evasion.  *See, e.g.*, *In re Does*, No. 1:00-CV-3919, 2000 WL 34538137 (S.D. Fla. Oct. 30, 2000) ("*American Express & MasterCard International, Inc.*"); Order, *In re Does*, No. CV-02-0049-MISC-PJH, ECF No. 4 (N.D. Cal. Mar. 27, 2002); *In re Does*, No. 02-22404-CIV, 2002 WL 32879613, at *1 (S.D. Fla. Aug. 20, 2002) ("*MasterCard International, Inc.*"); Order, *In re Does*, No. 03-22177 CIV-Martinez, ECF No. 10 (S.D. Fla. Apr. 2, 2004); Order, *In re*

*Does*, No. 04-cv-1548 (OES), ECF No. 5 (D. Colo. Aug. 2, 2004); Order, *In re Does*, No. 04-21986-CIV-UNGARO-BENAGES, ECF No. 5 (S.D. Fla. Aug. 5, 2004); Order, *In re Does*, No. 4:04-cv-94-1 (CDL), ECF No. 4 (M.D. Ga. Aug. 16, 2004).

Here, the evidence that the IRS has developed to date reasonably suggests the possibility that many users of SFOX platforms may not be properly reporting their tax liabilities with respect to cryptocurrency transactions conducted through those platforms.  Decl. ¶¶ 115-18.  Agent Lee is personally aware of several instances of previously unreported (and likely taxable) transactions involving SFOX users.  *See id.* ¶¶ 45-49, 102-12.  Moreover, the IRS knows that when third-party reporting is lacking, the incidence of tax non-compliance increases greatly.  And SFOX, like other prime dealers and virtual currency exchanges, does not issue Forms 1099 or otherwise engage in third-party transactional reporting to the IRS.  Additionally, as in the barter-exchange cases, the IRS's experience with cryptocurrency, especially with respect to the Coinbase John Doe summons, indicates a likelihood of non-compliance by SFOX customers.  This suspicion is bolstered by the internal IRS data search results.

Given this evidence, the IRS has far more than a mere suspicion that the John Doe Class includes taxpayers who are not complying with the law.  Rather, the evidence strongly suggests that there has been, and continues to be, failure by certain SFOX users to comply with the internal revenue laws in reporting the tax consequences of cryptocurrency transactions.  The "reasonable basis" prong of § 7609(f)(2) is therefore satisfied.

### C.  The Information Sought in the Summons Is Not Readily Available from Other Sources

The third requirement of § 7609(f) is that "the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources."  This prong

is met because the information sought in the summons to M.Y. Safra is not readily available to the IRS from other sources.  As noted above, there is no third-party reporting by SFOX to the IRS regarding the cryptocurrency transactions that are conducted on its exchanges.  *Id.* ¶ 46.  The IRS also has reason to believe that a significant portion of such transactions are not being properly reported by the taxpayers themselves either, but the IRS is presently unable to audit such taxpayers because their identities are unknown.  Further, while the IRS is also filing a petition in the U.S. District Court for the Central District of California seeking leave to serve a John Doe summons on SFOX itself, the IRS believes—based on information in its possession and because of the account services M.Y. Safra offers its users—that SFOX and M.Y. Safra may possess related, but qualitatively different, user and transaction information.  *Id.* ¶ 120.  Accordingly, the John Doe summonses for SFOX and M.Y. Safra make distinct requests that reflect the information each entity is believed to separately possess.  *Id.*; *see Am. Bankers Ins. Group*, 2003 WL 22953182, at *1 (finding § 7609(f)(3) met because "information sought by the IRS to continue their investigation is not readily available through a means other than from [the summoned party] itself").

    Where, as here, the IRS is unable to identify the members of the John Doe Class, and one of the principal purposes of the summons is to discover the class members' identities, courts have repeatedly found the § 7609(f)(3) prong of the test to be satisfied.[7]  Thus, courts have

---

[7] Though the summons to SFOX will also provide information about class members' identities, the IRS expects that it may need additional identifying information to assist it in positively identifying unique taxpayers.  Decl. ¶ 120.  For example, when the IRS received information in response to the Coinbase John Doe summons, it found that certain basic identifying information was missing, that some users had employed pseudonyms, and that it was difficult to match up Coinbase users with individual taxpayers when Coinbase lacked users' taxpayer identification numbers.  *Id.* ¶¶ 51-56.  Because M.Y. Safra performs additional KYC protocols when onboarding new customers, the IRS expects it to have additional identifying information, beyond that possessed by SFOX itself, that will enable the IRS to identify John Doe Class members.

approved summonses where the identities of the persons to be investigated are not readily

available but are known to digital currency exchanges.  *See* Order, *Circle Internet Financial,*

*Inc.*, *supra*; Order Granting Narrowed Petition, *Payward Ventures Inc. d/b/a Kraken*, *supra*.

Courts have similarly approved summonses where the identities of the persons to be investigated

are not readily available but are known to foreign institutions.  *See* Order Granting *Ex Parte*

Petition for Leave to Serve "John Doe" Summons, *In re Tax Liabs. of Does*, No. 11-cv-01686-

PJH, ECF No. 10 (N.D. Cal. Apr. 7, 2011) (authorizing John Doe summons to HSBC Bank

USA, N.A., seeking financial account records establishing the identities of U.S. taxpayers with

interests in HSBC's Indian bank accounts); *MasterCard Int'l, Inc.*, 2002 WL 32879613, at *1

(authorizing service of a John Doe summons seeking the identity of U.S. taxpayers who held

certain credit card accounts with ties to foreign banks); *Am. Express & MasterCard Int'l, Inc.*,

2000 WL 34538137, at *1 (identities of taxpayers not readily available except from American

Express and MasterCard International, Inc., who possessed credit card information for cards

issued by offshore banks).

     Even if it were theoretically possible for the IRS to obtain some of the information sought

in the summons from a labor-intensive review of its own files, that would not prevent

§ 7609(f)(3) from being satisfied.[8]  Courts take a "practical" approach when information "cannot

without unreasonable burden, expense and unwarranted delay be retrieved from the files of the

[IRS]."  *United States v. Reprints, Inc.*, 43 A.F.T.R.2d 79-463, 1978 WL 1238, at *1 (N.D. Ga.

Nov. 18, 1978); *see also United States v. John G. Mutschler & Assocs., Inc.*, 734 F.2d 363, 367-

68 (8th Cir. 1984) (in summons enforcement proceeding, taking "practical approach to IRS

---

[8] *Cf. Sugarloaf Funding, LLC v. U.S. Dep't of Treas.*, 584 F.3d 340, 350 (1st Cir. 2009) (holding, in summons enforcement proceeding, that "the IRS is entitled to obtain relevant records from third parties to compare for accuracy any records obtained from the taxpayer").

accessibility" in declining to order "manual search of 18,000 opinion letter applications" to

identify those prepared by summoned party, calling that "an unreasonable and imprecise

method" of locating information); *United States v. Berkowitz*, 488 F.2d 1235, 1236 (3d Cir.

1973) (per curiam) (noting, in summons enforcement proceeding, that "[t]o require the [IRS] to

review individually the millions of forms filed in 1971" to locate those sought by summons "is

so obviously burdensome as to make the procedure prohibitive" and concluding "from a practical

standpoint those returns would not be readily available to the government").

The only entities possessing information relating to virtual currency transactions that

identify the persons involved in the transactions, and that hold material relating to the

transactions, are the exchangers and any intermediaries.  Therefore, it is logical to summon M.Y.

Safra, which provided account services to SFOX's users, for this identifying and transactional

information regarding SFOX's users, as the IRS reasonably believes that M.Y. Safra possesses

information that is not readily available from any other source.

### D.  The Summons Is Narrowly Tailored to Information that Pertains to the Failure (or Potential Failure) of the Class to Comply with the Internal Revenue Laws

The additional requirement added to § 7609(f) in 2019 is that a John Doe summons must

be "narrowly tailored to information that pertains to the failure (or potential failure) of the person

or group or class of persons referred to in paragraph (2) to comply with one or more provisions

of the internal revenue law which have been identified for purposes of such paragraph."  This

narrow-tailoring requirement is met here because the summons requests are specifically directed

at information that will shed light on the potential non-compliance about which the IRS is

concerned—non-reporting of cryptocurrency transactions and non-payment of associated tax—as

well as the identities of those taxpayers who may not be in compliance.  As mentioned above,

this includes potential non-compliance with several provisions of the Internal Revenue Code, such as 26 U.S.C. §§ 1, 61, 451, 1011, 1211, and 1222.

Congress added this new requirement as part of the Taxpayer First Act, Pub. L. No. 116-25, § 1204(a), 133 Stat. 981, 988 (2019), and it applies to summonses served on or after August 16, 2019, *see id.* § 1204(b), 133 Stat. 989. Congress's intent was to ensure that "the information sought in the summons [is] at least potentially relevant to the tax liability of an ascertainable group," and that the summons is not used "for the purposes of a fishing expedition." H.R. Rep No. 116-39, at 41 (2019). The added text "is not intended to change the *Powell* standard"—*i.e.*, the showing the IRS must make in support of summons enforcement—"or otherwise affect the IRS's burden of proof." *Id.* at 42 (citing *United States v. Powell*, 379 U.S. 48 (1964)); *accord* U.S. Congress, Joint Committee on Taxation, *Description of H.R. 1957, the "Taxpayer First Act of 2019"* at 15 (Apr. 1, 2019), https://www.jct.gov/CMSPages/GetFile.aspx?guid=673878f4-0d0f-4304-a14c-c9740276676a [https://perma.cc/49QV-GWV6].

This statutory requirement is satisfied here. Agent Lee's declaration explains in detail the direct connection between each of the six types of records requested in the summons attachment and the IRS's investigation concerning non-compliance with the internal revenue laws. *See* Decl. ¶¶ 125-45. Those six requests fit into two categories. The first category is directed at adequately identifying members of the John Doe class so that transactional data can reasonably be associated with particular persons. *Id.* ¶¶ 129-34. For example, Request No. 1, which seeks account registration/application/opening records for each M.Y. Safra bank account associated with SFOX or an SFOX user, will assist the IRS in this process. *See id.* ¶¶ 129-31.

The second category of requests is directed at obtaining transactional information that may permit the IRS to evaluate whether particular taxpayers complied fully with internal revenue

laws.  *Id*. ¶¶ 135-41.  For example, Request No. 3 seeks all records of account activity, including records that reflect the particulars of transactions such as the date, the amount, and originator and beneficiary information.  These records should contain information necessary to determine the correct federal tax liability of applicable SFOX users.  *Id*. ¶¶ 135-39.  And Request 6 seeks all "exception reports" produced by M.Y. Safra's Anti-Money Laundering system and all records of investigation of such exceptions.  *Id*. ¶ 142.  As explained in Agent Lee's declaration, exception reports identify transactions that have been flagged as potentially abnormal and warranting investigation.  In the IRS's experience, the IRS can combine the information in exceptions reports with other information in its possession to assist in determining whether a taxpayer is in compliance with internal revenue laws.  *Id*. ¶¶ 143-45.

As these and other more detailed explanations in Agent Lee's declaration show, each of the items sought by the summons is specifically targeted toward obtaining information that may further the IRS's investigation of the John Doe Class and its members' failure (or potential failure) to comply with the internal revenue laws.  The narrow-tailoring requirement is therefore satisfied.

## CONCLUSION

For the foregoing reasons, the Government's petition to issue the John Doe summons should be granted.

Dated:  New York, New York                    Respectfully submitted,
        August 8, 2022

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:      /s/ Jean-David Barnea
         JEAN-DAVID BARNEA
         Assistant United States Attorney
         Tel.:    (212) 637-2679
         Fax:     (212) 637-2686
         E-mail: jean-david.barnea@usdoj.gov

27